In the Matter of the General Assignment for the Benefit of Creditors of FILM CLASSICS, INC., Assignor, to IRVING KAUFMAN, Assignee, Respondent.
WOODROW N. IRWIN, as Trustee for the Beneficial Owners of the Photoplay, "Not Wanted", et al., Appellants; WORLD WIDE DEVELOPMENT CORPORATION, Respondent.

VAN VOORHIS, J. (dissenting). The order in this assignment for the benefit of creditors proceeding, insofar as appealed from, is based upon the construction of the Irwin and Wein agreements. Special Term held that they created a debtor and creditor relationship between these two motion-picture producers and the distributor, Film Classics, Inc., and that consequently the producers could have no ownership in any assets earmarked as having been derived from the exhibition of the particular producer's picture. Special Term decided the proceeding solely upon the absence of a fiduciary relationship, due to the lack of which these producers were held to have no title to the moneys arising from the exhibition of their scenarios. If that holding be erroneous, then a new trial is necessary in order to determine whether any funds can be traced which are payable to the producers on these two contracts. Special Term evidently came to that conclusion on the theory that the patent and copyright cases furnish a controlling analogy.

The cases cited in the brief for respondent World Wide Development Corporation (*Ehrlich* v. *Jack Mills, Inc.,* 215 App. Div. 116, affd. 248 N. Y. 598; and cases cited on p. 119 of 215 App. Div.; *Stephenson* v. *Go-Gas Co.,* 268 N. Y. 372; *McKee* v. *Paradise,* 299 U. S. 119), and the cases of *Henderson* v. *Dougherty* (95 App. Div. 346) and *Moore* v. *Coyne* (113 App. Div. 52) hold that a debtor and creditor relationship ordinarily exists between licensor and licensee of patents and copyrights. *Stephenson* v. *Go-Gas Co.* (*supra*) holds that the interest in a corporation of an owner of participation operation certificates, entitled to participate in a fund to be created by setting aside a stated percentage of the gross receipts of a specified business, is that of a creditor. The court said that the certificate holders were coadventurers with the stockholders only in the sense that their investment, like the investment of stockholders, was hazarded upon the success of the company. All they had was a promise of the corporation that a stipulated portion of the proceeds would be set aside for the redemption of their certificates. The opinion, per LEHMAN, J., adds (p. 381) that " the relationship of trust upon which a right to an accounting in equity depends does not arise from a promise alone. There must be something analogous to a trust *res* — some business, property, income, profits or moneys in which the person asking the accounting has an equitable interest."

That this is the basis for the decisions cited in the patent and copyright cases is shown by the quotation in *Ehrlich* v. *Jack Mills, Inc.* (215 App. Div. 116, 119, *supra*) from Dean Langdell's " Survey of Equity Jurisdiction " (2d ed., p. 93), that when a book is published and sold by the publisher on his own account under an agreement to pay the author a fixed sum for every copy sold or a fixed percentage of the gross proceeds of sales, " the publisher is not accountable to the author, for the books sold (and hence their proceeds) are the property of the publisher — not of the author; and the money payable to the latter is merely the price of his copyright in the books sold. The relation, therefore, between the publisher and the author in such a case is merely that of debtor and creditor. The same is true also of a manufacturer who works a patent, under an agreement with the patentee to pay him a royalty on all the patented articles manufactured and sold." The reason for this rule is clearly that the publisher of a book, not the author, has made the investment and paid for the printing, that the publisher has underwritten the cost of the venture. The publisher owns the product that is placed upon the market, which only in an intellectual sense can be described as the creation of the author. The same thing is true of a product manufactured under a patent. The manufacturer pays for the raw material and the expense of fabrication, he owns the finished product when it is offered upon the market. The obligation of a manufacturer to an inventor, like that of a publisher to an author, is simply a promise to pay a specified amount, computed upon the quantity of units sold, contracted to be paid in exchange for a license under the monopoly conferred on the inventor by the government for thinking up the idea. If capital for the venture is contributed by author or inventor, then some additional security or contract right is usually given to him as it would be to any other capitalist, different in principle from a royalty or commission for the use of a manuscript or invention.

A motion-picture producer, upon the other hand, is in a different position from that of an author. The producer may stand in a debtor and creditor relationship to the author of the scenario or to the composer of the music, but that is not the relationship of the producer to the distributor. The

producer does not come to the distributor with merely a script or a tune which it is entitled to use; it has expended much money for actors, sets, orchestras and all of the other paraphernalia required for the production of a modern motion picture. The negative film which the producer agreed to supply under these agreements is far from being merely a text or script; it is the end result of a large capital investment, and is its tangible product. The producer is therefore more nearly in the position of a manufacturer or publisher, rather than in that of an author or inventor in the patent and copyright cases. The difference between these contracts to distribute motion pictures and a license under a patent or copyright, is that the agreements before us contemplate that title to the scenario remains in the producer, who continues to own the negative of the film of which the distributor becomes a bailee. This difference is recognized in the language of Dean Langdell, quoted in *Ehrlich* v. *Jack Mills, Inc. (supra)*, where he states that in the case of books, the reason for the debtor and creditor relationship is that books are the property of the publisher and not of the author. Where title is retained by the producer of a scenario, that property interest constitutes the "something analogous to a trust *res* — some business, property, income, profits or moneys in which the person asking the accounting has an equitable interest" mentioned in the opinion written by Judge LEHMAN in the *Stephenson* case (*supra*, p. 381), which creates the relationship of a fiduciary.

The retention of title to the scenario by the producer is demonstrated in the Irwin contract (notwithstanding its language describing the relationship as that of debtor and creditor) in subdivision B of paragraph twenty-fourth, which covers the subject of possible advances of money by the distributor to the producer. This portion of the contract reads: "The said advance shall not be required to be made, however, unless simultaneously with the making thereof, Producer delivers to Distributor *a Chattel Mortgage creating a valid first lien upon the Picture,* the income and properties thereof ° ° ° together with an Assignment by the Producer to Distributor of all of the Producer's share in the proceeds to be derived from the distribution of the Picture." (Italics supplied.) The reason on account of which the property in the scenario was contemplated by the parties as remaining in the producer, in contrast to books and patents, is clear. It is the enormously greater capital investment which is put into the production of a scenario by the producer, and the fact that the negative film is the product of that investment. Although it is true that under these contracts the distributor is called upon to provide the money necessary to make positive prints for distribution to exhibitors, the cost thereof is negligible compared to the production cost of the picture. This and other items of distribution expense are to be repaid to the distributor, together with the distributor's commissions, before the producer gets what it is entitled to receive from the production of these movies. The distinction between these contracts and patent and copyright cases is marked by the circumstance that in the latter instance the licensor gets a commission or royalty, whereas under these contracts the commissions go to the distributor. The language in the contracts that until the distributor shall have received its commissions and shall have been reimbursed for its expenses, it shall own the revenues from the exhibition of these motion pictures means merely that these items are a first lien on the proceeds, and that the distributor shall receive them in priority to payment to the producer of the net proceeds. Nothing indicates that title to the scenario has passed from the producer to the distributor; on the contrary, these contracts demonstrate by their language that

it is retained by the producer. The producer could not give a chattel mortgage upon the picture unless the producer continued to own the picture after the Irwin contract had been made. Of course the author of the scenario may be entitled to royalties, but the interest of the author in his royalties is a different kind of property right from the ownership of the picture by the producer. The obligation of the producer to pay royalties to the author would be that of a debtor, but the duty of the distributor to pay the excess over commissions and distribution expenses to the producer, is to deliver to it the proceeds of its own picture.

The words contained in these agreements that the distributor " shall retain and own all of the gross receipts until Distributor shall have recouped therefrom all sums, expenses or obligations incurred by Distributor, or any of its subsidiaries, sub-distributors, or franchise holders ", instead of supporting respondents' position, implies that the producer owns the receipts from the exhibition of the picture over and above such moneys as are required to reimburse and recompense the distributor. It is true that in the Irwin contract there is a clause stating that the relationship is to be deemed one of debtor and creditor. The Wein contract contains no language characterizing the relationship. In the case of either contract, the nature of the relationship is to be determined from the integral facts constituting it, rather than from what the parties chose to call it.

The order appealed from should be reversed and the proceeding remitted for a new trial, with costs to appellants to abide the event.

Peck, P. J., Glennon, Dore and Callahan, JJ., concur in decision; Van Voorhis, J., dissents and votes to reverse and grant a new trial, in opinion.

Order affirmed, with $20 costs and disbursements to the respondents. No opinion.